UNITED STATES of America, Plaintiff–Appellee,

v.

1.377 ACRES OF LAND, MORE OR LESS, SITUATED IN THE CITY OF SAN DIEGO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA; Western Sun Hotels - Hotel San Diego, Ltd., a California limited partnership; San Diego County; Redevelopment Agency of the City of San Diego; City of San Diego; Citicorp Leasing, Inc.; Mohammed Jelveh

Tehrani; Mrith Sriram, dba Pro Color Photo Shop; La Phok, Pacific Coast Chinese and Thai Food; Rith Phok, dba Pacific Coast Chinese and Thai Food; NY Long, dba Pacific Coast Chinese and Thai Food, Defendants,

and

Josephson Management, Josephson Management Company; Sushi Deli Express, Inc.; JS Foods; Defendants–Appellants,

SDH Properties, LLC, a California limited liability company, Defendant–Appellee.

No. 02–56423.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 6, 2003.

Filed Dec. 17, 2003.

Charles V. Berwanger and Brian B. Frasch, Gordon & Rees, San Diego, CA, for appellants Josephson Management Company and JS Foods.

Louis E. Goebel, Law Offices of Louis E. Goebel, San Diego, CA, for appellant Sushi Deli Express, Inc.

Todd S. Aagaard, Department of Justice, Environment & Natural Resources Division, Washington, D.C., for appellee United States.

Hodge L. Dolle, Jr., and Thomas M. Garcin, Dolle and Dolle, Los Angeles, CA, for appellee SDH Properties.

Before: BOOCHEVER, HALL, and O'SCANNLAIN, Circuit Judges.

## OPINION

CYNTHIA HOLCOMB HALL, Circuit Judge.

Appellants Josephson Management Company and Sushi Deli Express, Inc. appeal from a district court decision denying them compensation from Appellee SDH Properties, LLC. Appellants urge this court to find error in the district court's interpretation of the lease agreements between the Appellee and each of the respective Appellants, in which Appellants were deemed to have no independent contractual right to a portion of Appellee's condemnation award from the United States. For the reasons set forth below, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings not inconsistent with this opinion.

We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## I

### BACKGROUND

The Hotel San Diego was a weathered octogenarian by August, 2000,[1] a six-story building in the heart of downtown San Diego which was beginning to show signs of its age. What it lacked in aesthetics and upkeep it made up for in location—it abutted San Diego's federal courthouse, and sat just across the street from the munici-

pal courthouse. Its location attracted various restauranteurs, including the appellants, Josephson Management Company ("Josephson")[2] and Sushi Deli Express, Inc. ("Sushi Deli").

Josephson operated a chain of some thirty-nine Burger King franchises, nine Bruegger's Bagels shops, five Tony Roma's restaurants, and a Hooligan's restaurant in four states. Josephson thought the Hotel San Diego's location would be prime for a Burger King franchise which catered to the downtown lunchtime traffic, and on March 14, 1988, signed a lease with Western Sun Hotels–Hotel San Diego, Ltd. ("Western Sun"), the predecessor to the current owner, appellee SDH Properties, LLC ("SDH"). The lease provided for a 20–year term, plus four successive five-year options. Josephson agreed to provide all the improvements and furniture, fixtures and equipment ("FF & E") necessary to operate a Burger King restaurant. In exchange, Josephson received a very favorable base rent of $1 per square foot, approximately half that charged in nearby locations.

In addition, the lease dealt with the prospect of an eminent domain condemnation, which was a distinct possibility given the building's prime location near multiple courthouses in the downtown area. Specifically, Paragraph 12.3 provided that Josephson would "be entitled to receive" compensation for the "undepreciated value" of its improvements and FF & E, plus the "loss of goodwill to the extent proven by Tenant." In exchange, Josephson agreed to forgo its right to the bonus value of the "unexpired term of the lease."

---

1. The Hotel San Diego was constructed in 1914. This case commenced on August 11, 2000, when the United States filed a complaint in condemnation.

2. Appellants Josephson Management Co. and JS Foods, Inc., though separate entities, were

organized by Julian Josephson and Stanley Schmidt, who continue to operate as principals of the two companies. For the purposes of this opinion, both Josephson Management and JS Foods are referred to as "Josephson."

Josephson fulfilled its obligations under the lease for twelve years. It substantially renovated the premises by strengthening the floor of the restaurant, constructing new restrooms and a new mezzanine, razing and rebuilding the interior, and adding a new heating and cooling system. It built a substantial customer base for its Burger King by capitalizing on the central downtown location, which produced a ready supply of lunch patrons throughout the workweek.

Sushi Deli arrived at the Hotel San Diego a bit later. Sushi Deli's owner and president, Hiroe Otake, was recruited to the Hotel San Diego by Western Sun's principal, Dr. Glass, in mid–1990. Ms. Otake and her husband, Moto, had overseen the maturation of a small, 750 square foot sushi restaurant into a local cultural institution which, by 1990, was prepared to expand. Sushi Deli, like Josephson, was enamored with the location of the Hotel, particularly its proximity to the various downtown courthouses. Ultimately, after some months of negotiations, Sushi Deli entered into a lease with Western Sun on September 27, 1990. Sushi Deli's lease, like Josephson's, contained a provision concerning the effect of an eminent domain proceeding, Article 17. Article 17 reserved to Sushi Deli the right to recover its "ratable percentage" (also known as "bonus value") of any condemnation award or settlement.

Like Josephson, Sushi Deli occupied the premises at the Hotel San Diego without incident. It too built up a loyal customer base, which contributed to its profitability during the years it occupied the Hotel. When Sushi Deli became aware of the imminent eminent domain proceedings, it began its own search for a suitable building in which to relocate. Sushi Deli eventually moved its operations to the Spreck-

els Theater building, approximately two blocks away from the Hotel San Diego. Unfortunately, the move entailed significant costs. For about half the space it had in the Hotel San Diego, Sushi Deli was now paying twice the rent. Its customer base began to erode, and it has suffered substantial financial losses since the relocation.

On August 11, 2000, the Hotel San Diego was officially condemned by the United States in an eminent domain proceeding. *United States v. 1.377 Acres of Land, et al.,* No. 00–CV–1618 (S.D.Cal. Aug. 11, 2000). No party challenged the condemnation, and none of the parties before this court has any outstanding claims against the government in that regard. Rather, both Josephson and Sushi Deli chose to pursue claims against SDH in the apportionment stage of the condemnation proceedings, pursuant to the terms of their respective leases. Each alleged that they were entitled to share in the $11.5 million settlement obtained by SDH as just compensation for the taking.

On June 19, 2002, Judge James K. Singleton[3] issued his decision, which sided with Appellee SDH. The district court concluded that neither Josephson nor Sushi Deli had any basis for a claim against SDH "independent of the condemnation award from the United States." Specifically, it determined that the plain language of the Josephson lease contemplated compensation only to the extent that Josephson's interests were specifically provided for by the condemning authority. Moreover, although it failed to specifically address the language of the Sushi Deli–SDH lease, the district court concluded that no "bonus value" had been proven, and that the fact that rental rates were below market value

---

**3.** The Hon. James K. Singleton, District Judge for the United States District Court for the District of Alaska, sitting by designation in the Southern District of California.

was merely a reflection of the poor quality of the Hotel San Diego building.

## II

### A.

### STANDARD OF REVIEW

 In general, interpretation of the language of a contract is a question of law which is reviewed on a *de novo* basis, with no deference accorded to the decision of the district court. *In re Tamen*, 22 F.3d 199, 203 (9th Cir.1994); *Taylor–Edwards Warehouse & Transfer Co. v. Burlington Northern, Inc.*, 715 F.2d 1330, 1333 & n. 3 (9th Cir.1983). This is particularly true where the intent of the parties is easily ascertainable from the clear and explicit language of the contract. CAL. CIV. CODE §§ 1638–1639 (2002); *Bank of the West v. Superior Court*, 833 P.2d 545, 552 (Cal. 1992). Conversely, when the district court renders an opinion on a contract's language which is premised on extrinsic evidence, the court's findings of fact must be upheld unless clearly erroneous. *Tamen*, 22 F.3d at 203.

The parties to this case have disputed the appropriate standard of review to which the decision of the district court should be subject. Their dispute turns on the issue of whether the district court's decision in the instant matter was a purely legal interpretation of the plain language of the lease agreements, or was arrived at through the consideration of extrinsic facts.

### 1.

 The district court's order regarding the interpretation of the language of the Josephson lease can best be described as a conclusion of law, which must therefore be reviewed *de novo*. Very little extrinsic evidence was adduced at trial; in fact, the only testimony regarding the appropriate interpretation of the lease was offered by Julian Josephson, the principal of the Jo-

sephson Management Company. However, in arriving at its ultimate decision, the district court declined to rely upon that testimony, reasoning that it could not "reconcile [Josephson's] testimony with the plane [sic] language of the lease." Rather, the court concluded that it was "satisfied that this particular lease" did not compel SDH "to compensate [Josephson] for any loss." Thus, because the district court did not rely on any extrinsic evidence in rendering its decision with regard to Josephson's claim under the lease, its decision must be reviewed on a *de novo* basis.

### 2.

The district court's findings with regard to the interpretation of Sushi Deli's lease with SDH were sparse at best. The court concluded that it could "find[ ] no basis for a claim by the tenants against the landlord independent of the condemnation award from the United States." Though it failed to make the basis for its argument explicit, the district court must have concluded that the express language of Article 17, which provided that any condemnation award "shall be the property of both the Landlord and the Tenant in proportion to the respective possessory interests," did not afford Sushi Deli the right to any residual bonus value of the lease; otherwise, there would have been *some* basis for the claim asserted. Therefore, the district court's interpretation of the Sushi Deli lease agreement must be reviewed on a *de novo* basis, with no deference accorded to its finding. *Tamen*, 22 F.3d at 203; *Taylor–Edwards*, 715 F.2d at 1333 & n. 3.

 Contrary to the standard of review applicable to a district court's evaluation of the language of a lease, when the court's interpretation of a lease provision is based upon the consideration of extrinsic evidence, the decision is reviewed under the "clearly erroneous" standard. *Tamen*, 22

F.3d at 203. The court's decision will be upheld unless we are left with a "definite and firm conviction that a mistake has been committed." *Easley v. Cromartie,* 532 U.S. 234, 242, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001); *see also Hernandez v. New York,* 500 U.S. 352, 369, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) ("Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous.").

## B.

### DISCUSSION

Since the district court rendered its decision regarding the merits of the underlying claims based principally on the express language of the respective lease agreements, we now consider on a *de novo* basis whether each of the Appellants presented a valid claim entitling it to compensation from the Appellee. To the extent that its decision regarding the interpretation of either lease was premised on extrinsic evidence, we review the district court's determination for clear error.

### 1.

#### Josephson–SDH Lease

On March 14, 1998, following approximately six months of negotiations, Josephson and Western Sun entered into a lease agreement. Paragraph 12.3 of that lease provided:

In the event of Eminent Domain, [Josephson] shall be entitled to receive the following: (i) a sum attributable to the undepreciated value of all improvements and(or) alterations made to the Premises by [Josephson] in accordance with this Lease; (ii) a sum attributable to the undepreciated value of all furniture, fixtures and equipment installed on the Premises (except to the extent fully salvageable); and, (iii) compensation for loss of goodwill to the extent proven by [Josephson]. Any and all other amounts

awarded shall be payable to [SDH]. . . . It is expressly understood and agreed that in the event of a taking or partial taking, and whether or not this Lease is terminated, [Josephson] shall have no claim in respect to the award or payment for the value of the unexpired term of this Lease.

The primary bone of contention between SDH and Josephson is the extent to which Josephson is "entitled to receive" compensation from SDH, rather than from the condemning authority. SDH argues that Josephson is not entitled to collect payment from SDH for either the loss of goodwill, or the undepreciated value of improvements or FF & E.

#### i.

##### Loss of Goodwill

SDH contends that the language of Paragraph 12.3 was merely an affirmation of Josephson's right to receive, in accordance with California law, compensation from the state for lost goodwill. *See* CAL. CODE CIV. PROC. § 1263.510(a) ("The owner of a business conducted on the property taken . . . shall be compensated for loss of goodwill."). SDH points out that the lease agreement was drafted to be governed by California law, suggesting that loss of goodwill was only compensable to the extent provided for under California law. Josephson, by contrast, argues that SDH's interpretation would render Paragraph 12.3 mere surplusage.

█ Under California law, contracts are to be interpreted as a unified whole, with effect given to each provision to the greatest extent possible. CAL. CODE CIV. PROC. § 1610. Courts interpreting the language of contracts "should give effect to every provision," and "an interpretation which renders part of the instrument to be surplusage should be avoided." *Appalachian Ins. Co. v. McDonnell Douglas Corp.,* 214 Cal.App.3d 1, 12 (Ct.App.1989);

see also *United States v. Hathaway*, 242 F.2d 897, 900 (9th Cir.1957) ("A fundamental rule of construction is that a court must give effect to every word or term employed by the parties and reject none as meaningless or surplusage in arriving at the intention of the contracting parties."). If Paragraph 12.3 were intended to be nothing more than a recitation of rights to which Josephson was already entitled under California law, its inclusion in a lease governing the rights of the parties vis-a-vis one another as landlord and tenant would be unnecessary. Section 1263.510 authorizes a tenant who operates a business on condemned property to recover goodwill from the state condemning authority, regardless of whether or not a contractual provision purports to confer that right. Thus, to interpret Paragraph 12.3 in such a manner would effectively render it mere surplusage.

In addition, SDH's reading of Paragraph 12.3 is inconsistent with the provision of that Paragraph which relates to bonus value.[4] In Paragraph 12.3, Josephson waives its right to recover any compensation for the bonus value of the "unexpired term of th[e] Lease." The bonus value of a lease, like lost goodwill, is recoverable under California law as part of the condemnation award. CAL. CODE CIV. PROC. § 1260.220; *see also New Haven Unified Sch. Dist. v. Taco Bell Corp.*, 30 Cal.Rptr.2d 469, 472 (Ct.App.1994) ("Where the lease rental falls below market value, the lessor will have a claim to less than the full market value of the property, since he is restricted to the present value of actual contract rental; but the lessee will have a right to recover the balance of the market value, above that recovered by the lessor, as lease bonus value."). If indeed Paragraph 12.3 is intended simply to make explicit the rights to which Josephson would be entitled under California law, the waiver of its right to recover the bonus value of the lease would be odd, to say the least. It is almost unfathomable that a lease agreement would require a tenant to forsake rights it has *against the state*, particularly when that waiver occurs immediately after a statement of the tenant's other preserved rights against the state. The much more plausible interpretation would be that Paragraph 12.3 was intended to define the rights of the contracting parties vis-a-vis one another.

Finally, SDH's interpretation completely ignores the implicit *quid pro quo* of Paragraph 12.3. As SDH concedes, Josephson would be entitled to receive compensation from the state condemning authority for the loss of goodwill. In addition, Josephson would be entitled to a share of any award made to SDH in the amount of the bonus value of the lease. Given that the lease was negotiated by experienced attorneys representing sophisticated businesspeople, it confounds the imagination to conclude that Josephson would simply waive its statutory right to the bonus value of the lease without receiving something in return.

■ Paragraph 12.3 represents Josephson's bargained for exchange. SDH promised to compensate Josephson for the loss of business goodwill, perhaps in the event that it was the *federal* rather than the *state* government which condemned the property. Under federal law, as opposed to California law, tenants are not entitled to compensation for the loss of goodwill in eminent domain actions. *United States v. General Motors Corp.*, 323 U.S. 373, 383, 65 S.Ct. 357, 89 L.Ed. 311 (1945).[5] Recog-

---

4. "Bonus value" is generally defined as "the present value of the difference between economic rent, i.e., the value of market rental, and the contract rent through the remaining lease term" *City of Vista v. Fielder*, 919 P.2d 151, 154 n.1 (Cal.1996).

5. Josephson's suggestion in a footnote to its Opening Brief, that this panel reconsider the

nizing that possibility, Josephson in turn agreed to forgo its right to the bonus value of the lease, to which it was entitled under both state and federal law, essentially ceding that amount of compensation to the landlord. *New Haven*, 30 Cal.Rptr.2d at 472; *Gawzner v. Lebenbaum*, 180 F.2d 610, 612 (9th Cir.1950) (implying that bonus value is available in eminent domain actions instituted by the United States, since the tenant's "right of recovery was not limited to the ...'bonus value' "). In order to ensure that, if the federal government was the condemning authority, it would still be able to collect for the loss of goodwill, in Paragraph 12.3 Josephson relinquished its right to the bonus value of the lease. No other interpretation of Paragraph 12.3 is sensible.

Thus, the district court erred in concluding that Paragraph 12.3 was nothing more than a recitation of Josephson's rights under California's eminent domain law. The appropriate reading of Paragraph 12.3 is that Josephson is "entitled to receive" compensation for its lost goodwill from its landlord, SDH.

■ However, because of its interpretation of Paragraph 12.3, the district court

chose not to render an opinion regarding the value of the lost goodwill, which Josephson is required to prove under the terms of its lease ("Tenant shall be entitled to receive ... (iii) compensation for loss of goodwill *to the extent proven* by Tenant.") (emphasis added). Though Josephson presented the testimony of an appraiser who valued the goodwill of the Burger King operated by Josephson in the Hotel San Diego at $370,000, the appraiser did not consider the value of the lost goodwill to the entire Josephson Management Company, which operates dozens of restaurants throughout the West.[6] As such, the proper course of action is to remand to the district court for a ruling on the value of Josephson's loss of goodwill. *McKenzie v. Day*, 57 F.3d 1461, 1474 (9th Cir.1995) ("Appellate courts cannot make factual determinations which may be decisive of vital rights where the crucial facts have not been developed." (internal quotations omitted)).

ii.

*Tenant Improvements and FF & E*[7]

SDH contends that the provision of Paragraph 12.3 concerning Josephson's

---

rule promulgated in *General Motors,* was not raised prior to this appeal and is inappropriate for this proceeding. First, Josephson's contention falls outside the scope of this appeal. Josephson has already resolved its claims against the United States, and can not raise arguments which arise out of that separate judgment. *Williams v. Boeing Co.,* 681 F.2d 615, 616 (9th Cir.1982) (per curiam) (holding that where a case involves multiple claims, each of which is resolved in a separate final judgment, claims addressed in one judgment can not be raised in appeal from other judgments resolving separate claims). Second, even if Josephson's claim were procedurally appropriate, this panel would not be entitled to reverse well-established Supreme Court precedent which makes clear that the loss of goodwill is not compensable in federal condemnation actions. *General Motors,* 323 U.S. at 379–80, 65 S.Ct. 357; *see also Hutto v. Davis,* 454 U.S. 370, 375, 102 S.Ct. 703 (1982) ("[U]nless we wish anarchy to prevail within the federal judicial system, a precedent

of [the Supreme Court] must be followed by the lower federal courts.").

**6.** Given its disposition on the question of Josephson's right to recover against SDH for loss of goodwill, the district court chose not to address the issue of whether the Josephson–SDH lease entitled Josephson to compensation for the lost goodwill of the single Burger King in the Hotel San Diego, or the overall loss of goodwill suffered by the Josephson Management Company. Josephson's appraiser maintained that the lost goodwill was "segmentable" because of the nature of Josephson's holdings (primarily fast food restaurants). We do not express an opinion on whether the amount of goodwill to which Josephson is entitled under the lease is properly measured in relation to the entire Josephson Management Company, or the single Burger King entity at the Hotel San Diego. Rather, we will allow the district court the first opportunity to pass judgment on that issue.

right to compensation for improvements made to the premises at the Hotel San Diego is similarly a mere recitation of Josephson's rights under California law. *See* Cal. Code Civ. Proc. § 1263.210 ("[A]ll improvements pertaining to the realty shall be taken into account in determining compensation."). For the reasons set forth with regard to the provision providing for compensation for lost goodwill, the interpretation advanced by SDH does not accurately reflect the plain language of Paragraph 12.3.

As with the loss of goodwill provision, the provision regarding tenant improvements constitutes an implicit *quid pro quo* between lessor and lessee. In this case, SDH (or more accurately, its predecessor-in-interest, Western Sun) agreed to provide Josephson insurance for its initial outlay of capital investment, in exchange for Josephson's establishment of a nationally-recognized restaurant chain as an anchor tenant in the Hotel San Diego. To presume that the tenant improvements provision of Paragraph 12.3 was anything but a mutually agreed-upon exchange is not a sensible analysis of either that Paragraph, or the contract as a whole.

Moreover, as with the loss of goodwill provision, an interpretation of Paragraph 12.3 which suggests that it was not intended to affect the rights of landlord vis-a-vis

tenant would render that paragraph mere surplusage. Josephson would be entitled to compensation from a state condemning authority for the value of its improvements pursuant to § 1263.210 whether or not a contractual provision affirmatively made that entitlement explicit. SDH's interpretation of Paragraph 12.3 essentially renders it a nullity. Since such an interpretation must be avoided where possible, *Appalachian Ins. Co.*, 214 Cal.App.3d at 12, the only reasonable conclusion is that Paragraph 12.3 entitles Josephson to compensation from SDH for the value of the improvements it made to the realty.

However, because the district court failed to make any findings of fact regarding the "undepreciated value of all improvements and(or) alterations" made by Josephson, the issue of valuation must also be remanded to the district court for determination. [8] We shall therefore abstain from consideration of the appropriate interpretation of the term "undepreciated value" until the district court has been given an opportunity to pass on its significance.

### 2.

### *Sushi Deli–SDH Lease*

Article 17 of the Sushi Deli–SDH lease provides, in pertinent part:

All awards for the taking of any part of the premises or any payment made under the threat of the exercise of eminent

---

7. Since the analysis with respect to Josephson's entitlement under Paragraph 12.3(i) and (ii) is substantially similar, this section will refer only to Josephson's right to compensation for "tenant improvements," but is intended to apply to Josephson's claims for compensation for both improvements and furniture, fixtures and equipment.

8. SDH argues that because, in the compensation phase of the eminent domain action (Phase II), Josephson presented no evidence

regarding the value of the improvements, "which, arguably, may have increased the award from the condemnor," he is not entitled to any compensation. However, whether Josephson presented evidence in the condemnation proceedings is irrelevant; under the terms of Paragraph 12.3, Josephson is entitled to compensation from SDH, not the United States, for the value of its improvements. Thus, Josephson's failure to present evidence to contradict the government's appraisal in the compensation phase is beside the point.

domain shall be the property of both the Landlord and the Tenant in proportion to the respective possessory interests to the Premises....

The district court apparently accepted the argument posited by SDH, namely that, despite the lease provision, Sushi Deli would not be entitled to any portion of the condemnation settlement unless the settlement was structured so as to specify the precise amount to which Sushi Deli was entitled. That position fundamentally misunderstands the precedent in the field of eminent domain.

 It is well-established that when the government exercises its power of eminent domain, it compensates the people who have possessory interests in the seized land under the so called "undivided fee rule." Victor P. Goldberg, Thomas W. Merrill, & Daniel Unumb, *Bargaining in the Shadow of Eminent Domain: Valuing and Apportioning Condemnation Awards Between Landlord and Tenant*, 34 U.C.L.A. L. Rev. 1083, 1092–93 (April 1987). The "undivided fee rule" essentially operates by permitting the governmental authority to condemn property by providing just compensation, then allowing the respective interest holders to apportion the award among themselves, either by contract or judicial intervention. *See, e.g., Burkhart v. United States*, 227 F.2d 659, 662(9th Cir.1955) ("Usually, the courts treat the [eminent domain] proceeding for the division of proceeds as one of interpleader, where the government deposits the just compensation for the whole parcel and the landlord and tenant come in as claimants."); *Vivian v. Board of Trustees*, 152 Colo. 556, 383 P.2d 801, 803 (Colo. 1963) ("Once the reasonable market value of property subject to eminent domain proceedings has been established, the apportionment of that amount among persons claiming an interest therein is a matter of no concern to the condemnor."). Once the government provides just compensation

for the condemned property, its role is at an end, because "condemnors do not, as a practice, apportion the awards among the various interests involved." *Washington v. Farmers Union Grain Co.*, 908 P.2d 386, 389 (Was.Ct.App.1996). Rather, the apportionment is left to either the discretion of the court, or the allocation agreed upon by the parties in a contract. *City of South San Francisco v. Mayer*, 67 Cal. App.4th 1350, 1354, 79 Cal.Rptr.2d 704 (Ct.App.1998). Thus, the district court's conclusion that there was "no basis" upon which Sushi Deli could pursue a portion of the condemnation settlement independent of the government's award was erroneous. In fact, once the government settled on just compensation for the Hotel San Diego, Sushi Deli had every right to pursue its respective share through the apportionment process. Since parties are free to contract around the eminent domain rules, *City of Vista*, 919 P.2d at 156 ("[Eminent domain] rules may indeed be displaced by a provision of a lease to the contrary."), Sushi Deli was entitled to seek a share of SDH's condemnation settlement according to the terms of its lease.

### 3.

### *Bonus Value of Sushi Deli Lease*

 The district court rendered its decision in the instant matter in an opinion issued on June 19, 2002, which concluded that "none of the tenants have proven a true bonus value to have been included in the condemnation award." Rather, the court attributed the below market rent paid by the various tenants to the fact that the Hotel San Diego "was obsolete, poorly maintained, and not the highest and best use of the property." Complicating our decision, however, is the fact that the district court made no specific findings with regard to the bonus value of the Sushi Deli lease. Nonetheless, we need not give

great credence to the label affixed to the district court's conclusion. "The fact that the district court intermingled some of its findings of fact with its conclusions of law is of no significance. We look at a finding or a conclusion in its true light, regardless of the label that the district court may have placed on it." *Tri–Tron Intern. v. Velto*, 525 F.2d 432, 435–36(9th Cir.1975) ("the findings are sufficient if they permit a clear understanding of the basis for the decision of the trial court, irrespective of their mere form or arrangement"). Therefore, as long as the district court's conclusion that Sushi Deli had failed to establish any bonus value was supported by substantial evidence, it will not be overturned under the clearly erroneous standard.

At trial, the district court heard a great deal of testimony regarding the purported bonus value of the Sushi Deli–SDH lease. Sushi Deli's owner, Hiroe Otake, testified to the negotiations which ultimately culminated in her lease, the neighborhood in which Sushi Deli was located, and the general quality of the Sushi Deli premises.

The court also heard extensive testimony from James Bearden, the president of BTI Appraisal, who had been hired by Sushi Deli to "determine the fair market rental value and the value of any leasehold in Sushi Deli." The court admitted into evidence the appraisal report prepared by Mr. Bearden, in which he compared the premises of the Hotel San Diego to six "rental comparables" situated nearby. Though Mr. Bearden concluded that the fair market rental value of the Sushi Deli space was $2 per square foot, his conclu-

sion was based on a comparison to six "rental comparables" which were, arguably, substantially and materially distinguishable from the Hotel San Diego. [9]

Finally, to provide itself with background, the district court considered the "various appraisals" which had been submitted in the compensation phase of the proceeding, and "visited the premises with the parties and walked through the hotel." The government appraisers concluded that its highest and best use was "demolition and redevelopment." The Hotel San Diego was an 86 year-old building which had fallen into disrepair, so much so that it actually had an "economic disvalue."

In short, the district court had ample evidence on which to base its conclusion that the fair market rental value of the Sushi Deli premises was no more than the rental value provided for in the lease. Since the court was "not convinced that the difference in rental rates was not attributed to the condition of the San Diego Hotel [sic] building and not the negotiating skill of the tenants," it held that the tenants failed to prove that "they rented their space below the fair rental value of that space."

Since the district court considered evidence which was, at a minimum, sufficient for "reasonable minds [to] accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence," its determination that the Sushi Deli–SDH lease had no bonus value should not be disturbed. *Gilbrook*, 177 F.3d at 856.

### III

The plain language of the leases governing the rights and obligations of Josephson

---

**9.** Mr. Bearden compared the Hotel San Diego to six other properties situated in downtown San Diego. Among the six were five that had been built within the previous 11 years, and one which had been built only four years after the Hotel San Diego. Even that "compara-

ble," however, was distinguishable from the Hotel San Diego inasmuch as it was located in the Gaslamp Quarter, a vibrant and recently renovated commercial area in downtown San Diego.

and Sushi Deli, on the one hand, and SDH on the other, vested the tenants with the right to recover a proportionate amount of any condemnation award or settlement obtained by SDH. Accordingly, we hereby REVERSE the district court with regard to its interpretation of the Josephson and Sushi Deli leases, and REMAND for consideration of the amount of compensation to which Josephson is entitled for lost goodwill and the "undepreciated value" of tenant improvements and furniture, fixtures, and equipment.

However, Sushi Deli's lease limited its entitlement to compensation to a "ratable percentage" of the overall award procured by SDH. The "ratable percentage" only had value inasmuch as Sushi Deli's favorable lease terms were not reflective of the market value of the premises. To the extent that the ostensibly below market rent was in fact an accurate valuation of the leased premises, Sushi Deli was not entitled to compensation. Since substantial evidence supported its conclusion, we hereby AFFIRM the district court with regard to its determination that Sushi Deli had not proven a "bonus value" for which it was entitled to compensation pursuant to the terms of its lease.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.